CORBIN v. BOIES et al.

(Circuit Court, N. D. Illinois. April 30, 1888.)

PARTNERSHIP—LIMITED PARTNERSHIPS—INSOLVENCY—PREFERENCES.

A limited partnership, practically insolvent in August, 1882, was dissolved October 17th following, but the notice of dissolution was not published until December 2d following, and then only in a legal publication read by few persons besides lawyers. The remaining partners dissolved October 19th, and the notice of this dissolution was published at the same time as the other, but in a paper of extensive circulation. The business still went on, however, and the defendant bank cashed the firm's checks, although their account was overdrawn, and advanced them money on goods as collateral. This bank was friendly to G., the special partner, and it had been assured by him, as far back as August, that he, G., would see that the checks were made good, and had received further assurances from F., the managing partner, that, in case

the concern got into trouble, the bank would be protected. Between December 28, 1882, and January 20, 1883, the bank accepted unsecured notes of the general partners to a large amount in settlement of notes of the limited partnership maturing between those dates. On January 20, 1883, judgment was confessed by the general partners in favor of the bank, and the special partner, and execution so levied on the stock in trade that the bank got the first lien and G. the second; thus shutting out unsecured creditors of the limited partnership. The attorney of the partners, both special and general, was also the attorney of the bank. *Held,* that the bank had knowledge of the insolvency of the limited partnership, and was a party to the scheme to protect G. as against creditors of that firm, and that the judgment confessed in its favor was therefore void, under 2 Starr & C. St. Ill. c. 48, § 22, forbidding preferences by such partnerships in contemplation of insolvency.

In Equity. Bill by Chester C. Corbin, an unsecured creditor of Boies, Fay & Conkey, to set aside certain judgments confessed by them, as in fraud of the Illinois limited partnership act, (2 Starr & C. St. Ill. c. 84, pp. 1564–1568.)

*Wm. J. Manning,* for complainant.

*Flower, Remy & Gregory,* and *Turnbull, Washburn & Robbins,* for respondent bank.

GRESHAM, J. On March 30, 1882, William A. Boies, Benjamin B. Fay, Lucius W. Conkey, and Julius K. Graves, formed a limited partnership under the firm name of Boies, Fay & Conkey, to carry on the business of wholesale grocers for five years, at Chicago. Graves, a special partner only, was a resident of Dubuque, Iowa, where he remained; and, whether the business proved profitable or unprofitable, interest was to be paid on his capital of $50,000, at the rate of 20 per cent. per annum. Fay and Graves were brothers-in-law, and the former became financial and chief manager of the firm. In August, 1882, about five months after Graves became a limited partner, an inventory was taken of the assets, from which the book-keeper made a statement, showing the firm's financial condition. This statement embraced all the bills receivable, and although some of the debts due to the firm were then uncollectible and worthless, no deduction was made on that account. If such deduction had been made it would have appeared that the liabilities exceeded the assets. If the partners did not then know that the firm was insolvent, they must have known it was seriously threatened with insolvency and bankruptcy. This statement has not been produced, and Fay testified that a copy of it which was furnished him by the book-keeper had been lost or destroyed.

The Illinois statute[1] under which this limited partnership was formed provides that it shall not be lawful for any such firm, or any member thereof, in contemplation of bankruptcy or insolvency, and with the intention of preferring or securing one or more creditors to the exclusion of others, to make any sale, transfer, or assignment of their property or effects, or to confess any judgment, or create any lien on the property or assets, and that all preferences so made shall be utterly void. Instead of suspending business in August, 1882, and holding

[1] (2 Starr & C. St. Ill. p. 1568, c. 84, § 22.)

the assets as a special trust fund for the payment of its debts ratably among its creditors, as the firm should have done, it continued in business. Graves came to Chicago, and assumed Fay's duties as financial manager, that the latter might go east and buy more goods on the firm's credit. During the four or six weeks that Graves thus remained in the store, he had access to and examined the private ledger and other books and papers, which disclosed the firm's condition. An account was kept with the First National Bank of Chicago, of which L. J. Gage was vice-president and general manager, and in September, during Fay's absence, Graves called at the bank and told Gage that he would be personally responsible for all checks drawn by the firm's cashier during Fay's absence, and when the latter returned he assured Gage that, should the firm have trouble, the bank would be protected. The Commercial National Bank of Dubuque, of which Graves was a director, kept an account with the First National Bank of Chicago, and Graves and Gage had a personal acquaintance, if they were not personal friends. The evidence shows that in September, after Graves had promised that all the firm's checks should be paid, the bank permitted the firm to overdraw its account. On the 14th of October the firm needed money to pay an overdraft at the bank, and to meet paper which would soon become due, and Gage accommodated the firm with a demand loan of $10,000, for which amount he took the judgment note of the partners, with warehouse receipts for merchandise recently bought on the firm's credit, as collateral security. It is claimed that three days later,—October 17th,—the four partners signed an agreement dissolving the limited partnership, and that two days still later, Boies sold his interest in the firm to Fay & Conkey, on which day Boies, Fay & Conkey—Graves having retired three days before—signed the following agreement:

"It is hereby stipulated and agreed by and between the parties hereto that the partnership heretofore existing between William A. Boies, Benjamin B. Fay, and Lucius W. Conkey, under the firm name of Boies, Fay & Conkey, is this day dissolved by mutual consent. The said dissolution shall date from the 1st day of November, 1882, and legal notice thereof shall be published on or before the 10th day of November, 1882."

This paper or notice was published for the first time in the Chicago Daily Evening Journal, on December 2d; and the paper by which it is claimed the limited partnership was dissolved two days before, was published on the same day in the Chicago Legal News, a legal publication read by few besides lawyers. On the 18th of October, the day after the alleged dissolution of the limited partnership, the bank, through Gage, made another demand loan of $10,000 to the limited partnership, receiving as security other warehouse receipts of the same character. At the time of the alleged dissolution of the limited partnership, and the sale by Boies of his interest to Fay & Conkey, a large amount of the limited partnership paper was about to mature, and the firm was still purchasing goods; and the testimony shows that the partners deemed it unwise to then give notice of the alleged withdrawal of Graves and Boies. The business was continued in the name of the limited partnership,

with Graves' knowledge, and checks were signed in the firm name until December 2.    From October 6 to December 6, the over-drafts ranged from $557 to $10,126; and from December 4 to December 16, the bank paid checks drawn in the name of the limited partnership, payable to Graves, amounting to a large sum, and up to December 6, at least, charged such payment to the account of Boies, Fay & Conkey.    The goods which were pledged to the bank were part of the purchase made by Fay after the firm had become insolvent, and they were hauled direct from the freight depot to a warehouse, instead of to the store or warehouse of the firm.    On December 7, the bank, through Gage, made a demand loan of $8,000 to Fay & Conkey, taking in pledge therefor part of the new goods bought in the name of the limited partnership.    A note of Boies, Fay & Conkey, payable to Graves, for $5,000, was protested at Dubuque on the 14th of December, and sent to the First National Bank of Chicago for collection; and on January 20, 1883, Gage, for the bank, discounted customers' notes for Fay & Conkey, amounting to $3,459; and on the same day, with the firm's money, Graves paid the bank, through Gage, two notes of the limited partnership for $5,000 each, due in seven and nine days, respectively, before maturity; the bank then holding, with the knowledge of Gage, a $5,000 note of Fay & Conkey, indorsed by Graves, and payable two days later, and also other notes of Fay & Conkey, unindorsed and unsecured, for more than that amount.    It will thus be seen that paper of the limited partnership, which was not then due for seven and nine days, was paid in preference to a note of Fay & Conkey, on which Graves was liable as indorser, as well as unsecured notes of Fay & Conkey.    This payment was made after it had been determined that the firm should suspend, and prefer part of its creditors; and on the same day Graves and Fay & Conkey went to the office of Flower, Remy & Gregory for legal advice, which firm then was, and for some time had been, the general counsel of the bank and of the insolvent firm.    During the consultation which occurred with Mr. Remy, he visited the bank, and on his return stated that Gage would be satisfied with a judgment in favor of the bank for $40,-000, for which amount a judgment note was accordingly prepared, and signed by Fay & Conkey.    It was thought that with the warehouse receipts and the customers' discounted notes, this would amply secure the bank.    Two judgment notes,—one for $17,500, and the other for $27,-000,—were also executed by Fay & Conkey at the same time and place, payable to Graves; and it was agreed between Graves, Gage, and Remy that, when the judgments were confessed, including 5 per cent. for attorney's fees, executions should immediately issue, and that the bank's execution should be first levied, and that Graves' execution for $17,500 should be next levied, so that the bank and Graves might have liens prior to all other creditors.    Before leaving the store, on the evening of the same day, Fay & Conkey divided the firm money on hand, each receiving $566, and the next morning (Sunday) the same parties again met by appointment at the office of Flower, Remy & Gregory, where the book-keeper and cashier brought the firm's mail, which contained drafts

amounting to $2,215.38. These drafts were indorsed and delivered to Graves. At this interview Remy appears to have prepared notes upon which judgments were to be confessed in favor of other creditors. The mail brought to the firm on Monday morning about $1,300, which was divided between Fay, Conkey, and Graves, after which judgments were confessed in one of the state courts and in this court, in favor of the bank, Graves, and other creditors, on the judgment notes previously executed, amounting in the aggregate to $233,709.09, of which $10,658.65, represented attorneys' fees. Executions were immediately issued on the state court judgments, and handed to Remy, who delivered them to the sheriff of Cook county in such order as to secure to the bank the first lien, and Graves the second. These executions were levied upon the entire stock of merchandise of the firm, and the proceeds of the sale paid the bank's judgment in full, and something less than $10,000 on the Graves $17,500 judgment. The executions which were issued upon the judgments confessed in this court in favor of Graves, the Commercial National Bank of Dubuque, the Dubuque County Bank, and the Importers & Traders National Bank, were the same day returned *nulla bona*, and these parties joined in a creditors' bill against Fay & Conkey, with whose consent, on the following day, Bradford Hancock was appointed receiver. Hancock immediately qualified, and took possession of the firm's office, books, and bills receivable, without interfering with the sheriff's posesssion. On the 1st of March following, Chester C. Corbin, an unpreferred creditor of the limited partnership, for himself and such other creditors as might be willing to unite with him, commenced this suit against all the parties in whose favor judgments had been confessed, for the purpose of setting them aside, and having the assets of the insolvent limited partnership equally divided among the creditors. On March 31, 1883, a subpœna *duces tecum* was served upon Hancock, the receiver, to appear on April 4, before the examiner, with the books of the firm, and testify as a witness, and the evidence shows that after the service of this subpœna, and before the 4th day of April, he sold as old paper all the letter-press copy-books except one, the bank-books, check-book, and checks back of November, 1882, the cash-balance statements and bills payable book prior to July, and other books which were regarded as important by the expert book-keeper. This fact is all the more significant as Flower, Remy & Gregory were also the receiver's counsel.

Why was it thought necessary to dissolve the limited partnership on the 17th of October, and keep the fact a secret from the public until the 2d of December? And if there was no intention on the part of Graves and his partners to take advantage of any portion of their creditors, and allow Graves to escape liability as a partner, why was the agreement of dissolution published in the Chicago Legal News, a legal publication read by few except lawyers, instead of in the Evening Journal, a paper of much wider general circulation? And why did the notice which appeared in the Evening Journal of the same day say nothing about the retirement of Graves? What occurred prior and subsequent to October 17 fairly shows that the dissolution was a pretended one, and that the

form was gone through for the purpose of having Fay & Conkey, as general partners, confess judgments as they did, to protect Graves against his liability as special partner, and as indorser of the firm's paper. Prior to the secret dissolution of the limited partnership, the firm had placed in the hands of brokers in Chicago, New York, and Boston, its commercial paper for sale on the market; and three days before the same time the firm had pledged to the First National Bank goods bought by Fay on the credit of the insolvent firm, as collateral security for a demand loan of $10,000; and on the day following the secret dissolution they made another pledge of merchandise purchased in the same way, as security for another demand loan of the same amount. Between the time of the secret dissolution and the 2d of December a still larger amount of the firm's commercial paper was put upon the market for discount, and during the same time the firm was unable to pay its employes, its rent, and bills for current purchases in Chicago. The substitution of a large amount of the notes of Fay & Conkey for the notes of Boies, Fay & Conkey, furnishes still further evidence of a previously formed purpose to enable Fay & Conkey, as general partners, to confess judgments by way of preferences, and thus shield Graves. The judgment confessed in favor of the Commercial National bank of Dubuque, represented in part four notes of $2,500 each, drawn by Fay & Conkey in favor of Graves, for his accommodation. These notes did not represent an indebtedness of the firm, and yet Graves caused them to be treated as part of the firm's indebtedness, and that amount was paid out of the assets of the limited partnership. This was not done through inadvertence or mistake, for Graves knew the facts; and in the argument his counsel admitted that this was the debt of Graves, and not the debt of the firm. The judgment confessed at Graves' instance in favor of the Dubuque County Bank exceeded the indebtedness of the firm to that bank by about $3,000. The bank declined to receive more than the amount of its debt, and Graves collected and retained the excess. These circumstances are damaging to Mr. Graves' integrity.

This, the Corbin suit, came to a final hearing on November 17, 1885, when the court decreed that on the 20th of August, 1882, the limited partnership was insolvent, with the knowledge of each of the partners, and so continued until the termination of its business on the 22d of January, 1883, when Fay & Conkey, the pretended successors of Boies, Fay & Conkey, confessed the judgments already mentioned; that the acts of the partners, whereby they pretended to dissolve the limited partnership, were done with intent to defeat and evade the provisions of the statute of Illinois which prohibited preferences by such partnerships, and that all such acts were void; that the judgments were confessed by Fay & Conkey for the purpose of protecting Graves against loss as a member of the limited partnership, and as an indorser for it; that the judgments in favor of the Commercial National Bank for $14,396.49, the Dubuque County Bank for $12,002.38, the Importers & Traders National Bank of New York for $15,126, were confessed at the special instance of Graves, and that they, as well as the Graves' judgment in this court,

in all amounting to $68,758.24, were paid in full out of the equitable assets of the limited partnership; that Graves also received out of the assets of the limited partnership $9,781.18 on the judgment confessed in his favor in the state court,—$5,900 as profits, although the firm made no profits, and $2,741.38, being the amount taken by him on Sunday and Monday, January 21st and 22d. Graves was required by this decree to pay into court for the benefit of the creditors of the limited partnership, within 30 days, $100,796.71, which was the amount so received by him, or for his benefit, with 6 per cent. interest thereon from the date of payment. Flower, Remy & Gregory received upon the several confessed judgments, as attorneys' fees, $8,559.80, for which amount the court also entered a decree against them, with interest thereon at 6 per cent., the total decree being $9,886.57, which they were also required to pay to the clerk of the court within 30 days, for the benefit of the creditors of the limited partnership, it being thought that these sums would be sufficient to pay the claims of the unpreferred creditors; and the court reserved the right to thereafter decree against the First National Bank of Chicago, as the proof might justify.

At and before the hearing, Graves was represented by Flower, Remy & Gregory, and, not paying the decree within the time limited, an execution was issued against him, and returned *nulla bona,* after which an *alias* execution was issued, upon which the marshal indorsed a return that he had made a personal demand upon Graves for money or property to pay or satisfy the same, and he had refused to do either. An order was then entered on the application of the complainant, requiring Graves to personally appear before the court on October 30, 1886, and show cause why he should not be attached for contempt in failing to comply with the decree of the court. This he did not do, although personally served with a copy of the order. On November 1, 1886, it was adjudged that Graves had willfully disobeyed the orders of the court; that he was guilty of contempt of its authority; and that a writ be directed to the marshal of the Northern district of Illinois, commanding him to arrest Graves, and commit him to the jail of Cook county until he complied with the orders of the court, or was discharged by due process of law. Not finding Graves within his district, the marshal proceeded to Dubuque, where Graves resided, and there presented the writ to the district judge of the Northern district of Iowa, and requested that the proper process should be issued for his arrest and identification, in order that he might be removed to this district. This request was denied after argument of counsel. *In re Graves,* 29 Fed. Rep. 60.

The jurisdiction of this court, both as to subject-matter and the parties, including Graves, is not denied, and until the decree and orders are reversed they are binding upon him. When Graves refused to obey the orders and process of the court, and thus defied its authority, he was rightfully adjudged guilty of contempt. Section 725, Rev. St., declares that the courts of the United States shall have power to punish, by fine or imprisonment, persons guilty of contempt of their authority by disobedience to any lawful writ, process, order, rule, decree, or command.

By his willful disobedience of the orders and process of the court, Graves committed an offense against the United States for which he stands convicted and sentenced; and he is no more entitled to immunity in another jurisdiction than if he had escaped after conviction and sentence for a felony. In *Wartman* v. *Wartman,* Camp. Dec. 262, Chief Justice TANEY says: "Disobedience to the legitimate authority of the court, is by law a contempt, unless the party can show sufficient cause to excuse him." In speaking of this offense in *Fanshawe* v. *Tracy,* 4 Biss. 497, Judge DRUMMOND says:

"It is not a crime, in one sense, but it partakes of the nature and character of a crime; and I do not see why, if a man is imprisoned for a contempt of a court of the United States, and breaks jail and escapes into another state, he cannot be arrested and returned to his imprisonment under the authority of the United States."

In *New Orleans* v. *Steam-ship Co.,* 20 Wall 392, Justice SWAYNE says: "Contempt of court is a specific criminal offense." On this subject see, also, *In re Chiles,* 22 Wall. 157.

Graves should have paid into court the amount adjudged to be due from him, if he was able to do so; and if he was insolvent, or unable to satisfy the decree, he could and should have exonerated himself by personally appearing and showing that fact. It cannot be that the law is so impotent as to allow a party to resist a suit step by step, and, when a decree is entered against him, disobey it with impunity, by removing beyond the court's territorial jurisdiction.

Graves having thus, for the time being, at least, successfully defied the authority of the court, the complainant now asks for a decree against the First National Bank of Chicago for $40,000, paid to it in satisfaction of the confessed judgment, and also for $10,000 of the firm assets, paid to it on January 20, with interest on these amounts. This relief is asked on the ground that the limited partnership became insolvent as already stated; and, knowing that fact, the bank, through Gage, co-operated with Graves in his scheme, which had for its object the latter's protection against liability as special partner and as indorser. Graves needed the aid of the bank to accomplish his purpose, and it co-operated with him through Gage. The bank was apparently willing, if not desirous, that Graves should be protected against threatened loss, provided it did not suffer thereby. Gage testified that it was not until after the judgments had been confessed that he knew a limited partnership could not prefer one or more creditors to the exclusion of others. We have already seen that while Fay was absent buying goods, and Graves was occupying his place in the store, the latter told Gage he would see that all checks drawn by the firm's book-keeper were paid; that when Fay returned he promised Gage that if the firm got into trouble the bank should be protected; and that two days before the judgments were confessed it was agreed between Graves and Gage and Fay & Conkey, in the office of Flower, Remy & Gregory, who acted as counsel for all the parties, that the bank's judgment and execution should be a first lien and first paid, and that Graves' judgment should stand next in priority. After the proceeds of the sale had

been paid to the bank and Graves, nothing was left from this source for other creditors, nor was it expected that anything would be. On December 28 the bank, through Gage, accepted an unindorsed and unsecured note of Fay & Conkey in renewal of a note of the limited partnership due on that day. On December 29 the bank, through Gage, accepted another unsecured note of Fay & Conkey for $5,000 in renewal of a note of the limited partnership, for the same amount, due the same day. On December 30 the bank, through Gage, again accepted an unsecured note of Fay & Conkey of $5,000 in renewal of a note of the limited partnership, dated October 23, and payable 65 days after date. On January 9, 1883, the bank, through Gage, discounted an unsecured note of Fay & Conkey for $5,000; and paid to Graves $1,900 of the proceeds on a check of Fay & Conkey, and applied the residue in payment of debts of the limited partnership and in satisfaction of an overdraft of Fay & Conkey. On January 10 the bank, through Gage, discounted another unsecured note of Fay & Conkey for the same amount, and on the same day paid to Graves two checks drawn by Fay & Conkey in his favor, for $2,500 each. The testimony, including that of Gage, fairly shows that he doubted the solvency of Fay & Conkey as early as December 28, when he accepted the first of their unsecured notes in exchange for a note of the limited partnership for a like amount, and thus released Graves from liability. This conduct of Gage is strong evidence in itself that he had been made acquainted with some plan for the protection of Graves at the expense of the creditors of the limited partnership, and that something had been done or promised, upon the faith of which the bank was willing to take unsecured paper of two men, not entitled to credit, in renewal of paper of the limited partnership. The firm had lost money from the time it commenced business, and, after the inventory was taken in August, if not before, it was slow in meeting its payments. Its account was repeatedly overdrawn at the bank both before and after Graves' alleged withdrawal. Remy wrote the dissolution contracts, and Flower, Remy & Gregory were the general counsel for the firm, made collections for it, and from time to time gave the partners legal advice. It does not appear from the testimony that the members of the limited partnership had any reason for keeping their counsel ignorant of the firm's condition and purposes, or of Graves' retirement as a partner. It was known to the members of the limited partnership and to the bank that Flower, Remy & Gregory were counsel for both· and it is not unfair to assume, as I do, that any information that the counsel had of the condition and purpose of the insolvent firm, which it was material for the bank to know, was communicated to Gage. If the counsel knew that the limited partnership was insolvent, or threatened with insolvency, as I think they did, and that it had been dissolved, and did not communicate that information to the bank, they were unfaithful to it. The mere fact that Flower, Remy & Gregory continued to maintain the relation of counsel to the limited partnership as well as to its alleged successor, and also to the bank, indicates that the latter knew the financial condition of the former, and that there was co-operation between

them. But even if the bank in good faith continued to deal with the limited partnership, and afterwards with Fay & Conkey as its successor, without knowledge of anything indicating insolvency, or threatened insolvency on the part of either, and that Graves had ceased to be a special partner, it was bound by the knowledge which its counsel had upon these subjects.

A decree will be entered against the bank for the amount it has received in satisfaction of the judgment confessed in its favor, with interest.